Christopher A. Seeger
Christopher Ayers
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-1000

# UNITED STATES DISTRICT COURT FOR THE

# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Jose RUIS and Charles SINERI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TOYOTA MOTOR CORPORATION, TOYOTA MOTOR NORTH AMERICA, INC., TOYOTA MOTOR SALES, USA, INC., and TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.,<br><br>Defendants. | Civil Action No. _____<br><br><br><br>**CLASS ACTION COMPLAINT and <u>DEMAND FOR JURY TRIAL</u>** |

Plaintiffs Jose Ruiz and Charles Sineri (collectively "Plaintiffs"), on behalf of himself and all others similarly situated (the "Class"), alleges the following against defendants Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Sales, USA, Inc., and Toyota Motor Engineering & Manufacturing North America, Inc. (collectively "Toyota" or "Defendants"). The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel.[1]

## I.    INTRODUCTION

1.    This action concerns a dangerous defect in the low-pressure fuel pump (the "Fuel Pump Defect" or "defect") which can fail and cause Toyota's most popular models, such as the Corolla, as well as it marque Lexus vehicles, to unexpectedly stall and cause engine shut down even when the vehicle is at high speeds, presenting an immediate and unreasonable risk of physical injury or death.

2.    The fuel system is  one of the most basic and critical systems in every gasoline-powered vehicle sold in the United States and throughout the world because it controls speed and keeps the  engine running unless until the driver chooses to turn it off.  The fuel injection system uses fuel pumps to manage the flow of fuel from the fuel tank to the engine. Without fuel, a vehicle will lose power even if in operation.

3.     The fuel system is also a key to safe operation of a vehicle.  If the fuel system in a vehicle is defective, the vehicle will no longer accelerate and decelerate controllably and could stall and lose power completely, even when in operation and in motion, exposing occupants and others to

---

[1] Counsel's investigation includes an analysis of publicly available information, including investigations by the National Highway Traffic Safety Administration ("NHTSA"), vehicle recalls, and additional analysis.  Plaintiffs believe that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

extreme danger, or even death.  A vehicle that stalls or suffers engine failure is at heightened risk of collision, and those stranded as a result of vehicle shutdown experience a heightened risk of danger.

4.      Toyota has manufactured, marketed and sold the  Class Vehicles with defective low-pressure fuel pumps that cause   unpredictable acceleration and engine stalls and render the Class Vehicles unsafe to operate.

5.      Despite knowledge of the defect, Toyota failed to fully disclose the defect and the corresponding dangers to Plaintiffs and members of the Class, and has not repaired or replaced the defective systems and  continues to sell its vehicles with the unsafe and defective fuel  systems.

6.      Class Vehicles include *all* Toyota and Lexus models that use the Denso low-pressure fuel  pumps and fuel pump assemblies, including pumps that begin with part number prefix 23220- and 23221-.

7.      On January 13, 2020, Toyota initiated a voluntary safety recall with National Highway Traffic Safety Administration ("NHTSA") concerning these defective fuel pumps (the "Initial Safety Recall"), recalling nearly 700,000 vehicles.  Exhibit A hereto.

8.      On March 4, 2020, Toyota expanded the recall (the "Amended Safety Recall"), to include over 1.8 million vehicles, nearly tripling the number of vehicles subject to the recall.  The expanded recall includes vehicles as early as the 2013 model year and spans all of Toyota's major models.  Exhibit B hereto.

9.      On March 19, 2020, and most recently on April 9, 2020, Toyota again amended its Safety Recall (the "Second Amended Safety Recall" and "Third Amended Safety Recall"), adding tens of thousands of vehicles to the recall and updating the impact of the defect on warranty claims and the status of Toyota's ongoing investigation. Exhibits C & D hereto.

10.     As of the date of this complaint, the recalled vehicles include the following: 2013 through 2015 Lexus LS 460 sedans; 2013 through 2015 Lexus GS 350 sedans; 2014 Toyota FJ

Cruiser SUVs and Lexus IS-F sedans; 2014 and 2015 Toyota 4Runner, Toyota Land Cruiser; Lexus GX 460, and Lexus LX 570 SUVs; 2014 and 2015 Lexus IS350 sedans; 2015 Lexus NX 200t SUVs and RC 350 coupes; 2017 Lexus IS 200t sedans and RC 200t coupes; 2017 and 2019 Toyota Sienna minivans and Lexus RX 350 SUVs; 2018-2019 Lexus GS 300 sedans; 2018 and 2019 Toyota Avalon, Toyota Camry, Toyota Corolla, Lexus ES 350, Lexus GS 350, Lexus IS 300, Lexus LS 500, Lexus LS500h, and Lexus IS 350 sedans; 2018 and 2019 Toyota Highlander and Sequoia SUVs and Tacoma and Tundra trucks; 2018 and 2019 Lexus LC 500, LC 500h, RC 300, and RC350 coupes and RX 350L SUVs; 2and 020 Toyota Highlander  (collectively, the "Recalled Vehicles").

11.     It is believed based on investigations completed to date that the defective fuel system was used by Toyota in more than the Recalled Vehicles.  Based on Toyota's use of the underlying, defective part and complaints to NHTSA, this  defect has existed in fuel pumps used in Toyota and Lexus vehicles since at least 2013, and continues to the present day in far more vehicles than the recall covers.

12.     As a defect that compromises the safety of the Class Vehicles, the Fuel Pump Defect renders the Class Vehicle less valuable than consumers paid and creates out-of-pocket expenses that the consumer is left to carry.  Such a defect also heightens any duty Defendants had to disclose the defect.

13.     Plaintiffs accordingly bring this class action complaint to recover on behalf of the Class all relief to which they are entitled, including but not limited to recovery of the purchase  price of their vehicles, compensation for overpayment and diminution in the value of their  vehicles, out-of-pocket and incidental expenses, and an injunction compelling Defendants to replace   or recall and fix the Class Vehicles.

## II.    PARTIES

**A.    Plaintiffs**

**Plaintiff Jose Ruiz**

14.    Plaintiff Jose Ruiz is a resident of the New Jersey, in Atlantic City. On March 1 2018, Plaintiff purchased his 2018 Corolla (a Class Vehicle) at Shore Toyota (an authorized Toyota Dealership) in Mays Landing.

15.    Unknown to Plaintiff at the time the Class Vehicle was purchased, it was equipped with the defective fuel system with the Fuel Pump Defect. Defendants' unfair, negligent, and deceptive conduct in designing,  manufacturing, marketing, selling, servicing, and leasing the Class Vehicle with the Fuel Pump Defect has caused Plaintiff out-of-pocket loss and diminished value of the  Class Vehicle.

16.    Plaintiff purchased the Class Vehicle for personal and family uses. Prior to choosing the Class Vehicle, Plaintiff considered the safety and reliability of the Class Vehicle, which was the subject of Defendants' extensive marketing of the Class Vehicles, which features were important to Plaintiff.  At no time prior to Plaintiff's decision to acquire the Class Vehicle did Defendants disclose that the Class Vehicle possessed any fuel system defects.

17.    Had Toyota disclosed the Fuel Pump Defect and the corresponding dangers, and the fact that Toyota would require  Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and he would not have chosen the Class Vehicle or would have paid less for it.

**Plaintiff Charles Sineri**

18.    Plaintiff Charles Sineri is a resident of the New Jersey, in Egg Harbor Township. On March 1, 2019, Plaintiff purchased his 2019 Lexus RX350 (a Class Vehicle) at Shore of Atlantic (an authorized Toyota Dealership) in Egg Harbor Township.

19.     Unknown to Plaintiff at the time the Class Vehicle was purchased, it was equipped with the defective fuel system with the Fuel Pump Defect. Defendants' unfair, negligent, and deceptive conduct in designing,  manufacturing, marketing, selling, servicing, and leasing the Class Vehicle with the Fuel Pump Defect has caused Plaintiff out-of-pocket loss and diminished value of the  Class Vehicle.

20.     Plaintiff purchased the Class Vehicle for personal and family uses. Prior to choosing the Class Vehicle, Plaintiff considered the safety and reliability of the Class Vehicle, which was the subject of Defendants' extensive marketing of the Class Vehicles, which features were important to Plaintiff.  At no time prior to Plaintiff's decision to acquire the Class Vehicle did Defendants disclose that the Class Vehicle possessed any fuel system defects.

21.     Had Toyota disclosed the Fuel Pump Defect and the corresponding dangers, and the fact that Toyota would require  Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and he would not have chosen the Class Vehicle or would have paid less for it.

**B.     Defendants**

**Toyota Motor Corporation**

22.      Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation located at 1 Toyota-Cho, Toyota City, Aichi Prefecture, 71-8571, Japan. TMC is the parent corporation of Toyota Motor Sales, U.S.A., Inc.

23.      TMC, through its various entities, designs, manufactures, markets, distributes and sells Toyota automobiles in the United States, including New York.

**Toyota Motor North America, Inc.**

24.      Defendant Toyota Motor North America, Inc. ("TMNA") is incorporated in California, with its primary address at 6565 Headquarters Dr., Plano, Texas 75024. TMNA is a holding company of subsidiaries of TMC located in the United States, including the below codefendants.

**Toyota Motor Sales, U.S.A., Inc**.

25.      Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is incorporated and headquartered in the State of California, with its primary address at 6565 Headquarters Dr., Plano, Texas 75024.

26.      TMS is the United States sales and marketing division for TMC, which oversees sales and other operations across the United States. TMS was responsible for Toyota's marketing of the Class Vehicles as safe and dependable and the issuance of express warranties covering repairs of the Class Vehicles.

27.      TMS distributes Class Vehicles and sells them through a network of dealerships that are the agents of TMS. Money received at the dealerships from the sales of Class Vehicles goes from the dealers to the TMS.

**Toyota Motor Engineering & Manufacturing North America, Inc.**

28.      Defendant Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is incorporated in Kentucky and has its primary address at 6565 Headquarters Dr., Plano, Texas 75024.

29.      TEMA is the engineering division for TMS, including engineering design and development, R&D and manufacturing in North America.

### III.    JURISDICTION

30.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims because those claims are integrally related to the federal claims and form part of the same case and controversy under 28 U.S.C. § 1367.

31.    This Court has personal jurisdiction over Toyota by virtue of its transacting and doing business in this District, including locating and operating its headquarters in Camden, New Jersey, in this District. Defendants have purposefully availed itself of the benefits and protections of the District of New Jersey by continuously and systematically conducting substantial business in this judicial district.

### IV.    VENUE

32.    Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Toyota licenses authorized dealers in this District, it advertises in this District, and it profits from its activities conducted within this District.

### V.    FACTUAL ALLEGATIONS

**A.    The Defective Fuel System**

33.    The Toyota fuel system relies on two fuel pumps to supply fuel to the engine: a low pressure fuel pump (in-tank) and high pressure fuel pump (in-line). The low pressure fuel pump is mounted inside the fuel tank and pumps fuel from the fuel tank to the engine by pushing fuel to the fuel injection system. The impeller, located under the pump motor is a plastic disk that rotates and draws in fuel and impels it up through the pump, which looks like this:



34.    The Toyota Recalls described the defect as the impeller deforming which resulted in blockage of the flow of fuel to the engine.  The Initial Safety Recall focused only on the deformation of the impeller, stating that:  "The subject vehicles are equipped with a low-pressure fuel pump, located in the fuel tank, that supplies fuel pressure to the fuel injection system. These fuel pumps contain an impeller that could deform due to excessive fuel absorption."  Exhibit A, at 11.

35.    With the latter amendments to the Safety Recall, Toyota reaffirmed that the impeller impeller was not dense enough and acknowledged that its deformation blocks the flow of fuel to the engine.  As the Third Amended Safety Recall states:  "The subject vehicles are equipped with a low-pressure fuel pump, located in the fuel tank, that supplies fuel pressure to the fuel injection system. These fuel pumps may include impellers which have been manufactured with lower density. If these impellers are also (1) of a type with lower surface strength or (2) of a different type but were exposed to production solvent drying for longer periods of time, higher levels of surface cracking may occur. In this condition, excessive fuel absorption may occur, resulting in increased impeller deformation. In some cases, the impeller may deform to a point that creates sufficient interference with the fuel pump body to cause the fuel pump to become inoperative."  Exhibit D, at 34.

36.     The "Safety Risk" posed by the defect included, warning lights, rough engine operation, failure to start or stalling, even at high speeds: "if impeller deformation occurs, the impeller may interfere with the fuel pump body, and could result in illumination of check engine and master warning indicators, rough engine running, engine no start and/or *vehicle stall while driving* at low speeds.  However, in rare instances, *vehicle stall could occur while driving at higher speeds, increasing the risk of a crash*." *Id.*, at 11-12 (emphases added).

37.     Notwithstanding the potentially catastrophic consequences of failure, Toyota delayed in reacting to the failures that were happening in the field, and the recall ultimately included only some vehicles believed to have the defective fuel pump.

**B.     Toyota Has Not Acted to Address the Fuel Pump Defect in Class Vehicles**

38.     Toyota has acted too late and too little in addressing the defect.

39.     Toyota has for many years sourced components, including fuel system components in its vehicles from Denso Corporation, a Japanese auto parts supplier which it had established and for which it still remains the largest shareholder.

40.     As early as 2015, Denso had recognized that the low-pressure fuel pumps that it supplied to Defendants and other manufacturers were prone to failure in the same manner as the failure that drove the Safety Recall.

41.     In a patent application filed in 2016, Denso admitted that the composite (plastic) impellers in its current and earlier low-pressure fuel pumps "may be swelled due to the fuel and water contained in the fuel, [and] therefore a rotation of the impeller may be stopped when the impeller is swelled and comes in contact with the [fuel pump] housing."

42.     From the outset, Toyota's actions to address the defect lagged far behind this reality.  During the first four months of 2020 when it first acknowledged publicly the Fuel Pump

Defect, Toyota continued to expand the number of Recalled Vehicles, delaying notification to each and every affected owner.

43.    In its March 4, 2020 Amended Defect Report to NHTSA, Toyota acknowledged that it knew about the failures related to the defective fuel pumps as early as June 2019. Exhibit E hereto at 8. However, it took no action to address the consequences of the defect until the middle of 2020, when it finally began to notify owners of only some of the Class Vehicles and promised to provide replacement pumps which were not defective.

44.    Despite the severe safety concerns raised by the defect, Plaintiffs believe that Toyota has not acknowledged the full extent of the defect or full scope of the Class Vehicles and has not provided full notice and remediation of the defect even in all the Recalled Vehicles. Owners of Class Vehicles are left without the means to replace the pump or even the knowledge that this dangerous defect exists.

45.    Even for the Recall Vehicles, Toyota has not fulfilled its obligations. Since public acknowledgment of the defect, NHTSA has been swamped with complaints by owners who either have not received notice of the defect (and the recall repair) or have been turned away at dealers when they seek to have their defective fuel pumps replaced.

46.    These reports have included persons whose fuel pump fails while being told to wait, like this May 1, 2020 report from an owner of a 2018 Toyota Highlander:

> THE CONTACT OWNS A 2018 TOYOTA HIGHLANDER. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 20V012000 (FUEL SYSTEM, GASOLINE). THE CONTACT STATED AFTER STARTING THE VEHICLE, THE VEHICLE IDLED ROUGH. THE LOW-PRESSURE WARNING LIGHT WAS ILLUMINATED. THE CONTACT STATED THAT THE MANUFACTURER EXCEEDED A REASONABLE AMOUNT OF TIME FOR THE RECALL REPAIR. THE CONTACT CALLED AVONDALE TOYOTA (10005 W, PAPAGO FWY, AVONDALE, AZ 85323, (877) 554-6890) AND WAS INFORMED THAT PARTS WERE NOT AVAILABLE FOR THE RECALL REPAIR. THE CONTACT WAS OFFERED A LOANER VEHICLE BUT DECLINED THE OFFER. THE VEHICLE WAS NOT DIAGNOSED NOR REPAIRED. THE MANUFACTURER

WAS NOT CONTACTED. THE FAILURE MILEAGE WAS 9,000. PARTS DISTRIBUTION DISCONNECT.[2]

47.     Similarly, this 2019 Avalon owner's fuel pump failed while she was waiting for her replacement part:

THE CONTACT OWNS A 2019 TOYOTA AVALON. THE CONTACT STATED THAT WHILE DRIVING 35-40 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE VEHICLE WAS RESTARTED. ADDITIONALLY, WHILE THE VEHICLE WAS IDLING, THE VEHICLE HESITATED WITH THE CHECK ENGINE WARNING LIGHT ILLUMINATED. THE VEHICLE WAS TAKEN TO TOYOTA OF TRI-CITIES (6321 W CANAL DR, KENNEWICK, WA 99336, (509) 736-9900) BUT WAS NOT DIAGNOSED NOR REPAIRED. THE VEHICLE WAS INCLUDED IN NHTSA CAMPAIGN NUMBER: 20V012000 (FUEL SYSTEM, GASOLINE) HOWEVER, THE PART TO DO THE RECALL REPAIR WAS NOT YET AVAILABLE. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 40,000. PARTS DISTRIBUTION DISCONNECT.[3]

48.     These reports also include owners whose fuel pumps have not yet failed and who have been turned away and left with the defective fuel pumps in their vehicles.

49.     For example, on August 12, 2020, one owner of a 2018 Toyota Highlander reported that they received notice of the recall, but that there were no parts available to fix her vehicle:

THE CONTACT OWNS A 2018 TOYOTA HIGHLANDER. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 20V012000 (FUEL SYSTEM, GASOLINE) HOWEVER, THE PART TO DO THE REPAIR WAS NOT YET AVAILABLE. THE CONTACT STATED THAT THE MANUFACTURER HAD EXCEEDED A REASONABLE AMOUNT OF TIME FOR THE RECALL REPAIR. AN UNKNOWN DEALER WAS CONTACTED AND CONFIRMED THAT PARTS WERE NOT YET AVAILABLE. THE MANUFACTURER WAS MADE AWARE OF THE ISSUE. THE CONTACT HAD NOT EXPERIENCED A FAILURE. VIN TOOL CONFIRMS PARTS NOT AVAILABLE.[4]

50.     On May 2, 2020, another Highlander owner was still waiting for the recall repair, and, like many others, just wanted Toyota to buy her car back:

LEARNED OF RECALL IN JAN. 2020--SINCE THEN TOYOTA HAS NOT PROVIDED A REMEDY FOR THIS RECALL BASED ON DIRECT CONTACT WITH

---

[2]  NHTSA Complaint No. 11338202.
[3]  NHTSA Complaint No. 11331972.
[4]  NHTSA Complaint No. 11348834.

TOYOTA, THE DEALERSHIP I PURCHASED VEHICLE FROM,NTHSA AND MEDIA---I HAVE VERY LIMITED USE OF VEHICLE BECAUSE OF THE CHANCE FOR ACCIDENTS AND BEING STRANDED IF VEHICLE SHUTS DOWN,WOUKD LIKE TOYOTA BUY BACK VEHICLE.[5]

51.    On August 10, 2020, the owner of a 2019 Tacoma pick-up truck also wanted Toyota to buy back the truck when they had already waited two months and were told there would more months to wait:

TRUCK IS CURRENTLY SITTING IN TOYOTA SERVICE LOT FOR NEXT 2 MONTHS DUE TO FUEL PUMP RECALL. TRUCK IS UNSAFE TO OPERATE AND WILL DIE ANYWHERE RANDOMLY  THEY HAVE NO FIX UNTIL END OF SEPTEMBER 2020 WHEN PARTS COME IN.

WISH THEY WOULD BUY IT BACK, SO THAT I CAN GO BUY A DEPENDABLE TRUCK INSTEAD OF SENDING LOAN PAYMENTS TO A TRUCK THAT'S NOT IN MY POSSESSION FOR OVER 2 MONTHS.[6]

52.    On August 22, 2020, a 2018 Avalon owner was told that there would be no parts until September or October, like every other owner being left to drive her car for months more with the defective fuel pump:

I OWN A 2018 TOYOTA AVALON THAT IS SUBJECT TO RECALL FOR A POTENTIALLY DEFECTIVE FUEL PUMP. I TOOK THE CAR IN 8/3/2020 TO FIX THE PROBLEM. I WAS ADVISED THE DEALER DID NOT HAVE THE CORRECT FUEL PUMP IN PARTS AND THAT IT WILL BE LATE SEPT. OR OCT. BEFORE THEY HAVE THE CORRECT FUEL PUMP. IN THE INTERIM, I HAVE A VEHICLE WITH A POTENTIAL SAFETY ISSUE.[7]

53.    Rather than spend the money necessary to address the defect, or at least warn all affected customers that they have cars equipped with faulty fuel pumps, Toyota has shifted the significant  and serious risk of inoperable vehicles, accidents, injury, and even death onto its customers.  Toyota has not adequately notified all the effected consumers about the defect or advised them to stop driving their Class Vehicles until repairs can be made and does not provide loaner cars

---

[5]  NHTSA Complaint No. 11323056.
[6]  NHTSA Complaint No. 11344243.
[7]  NHTSA Complaint No. 11350749.

or other, alternative transportation pending such repairs.   This leaves the consumers shouldering the

costs, both financial and in a sense of well-being and safety, of the fuel system defect

**C.    NHTSA Complaints Reveal That the Fuel Pump Defect Poses Serious Safety Risks**

54.    The thousands of complaints of Class Vehicle owners to NHTSA about the failure of

their fuel pumps makes clear the scope and impact of the defect in the Class Vehicles.   By way of

example:

55.    On June 27, 2020, the owner of a 2019 Camry reported intermittent and rough

performance:

> CHECK ENGINE LIGHT CAME ON AND THE PERFORMANCE OF THE VEHICLE
> IS BAD. BAD IDLE, WEAK ENGINE, JUST THE CAR IS NOT PERFORMING
> PROPERLY. I USED THE SCANNER TO SEE THE CODE AND I HAD MORE THAN
> ONE . P0171 P0505 P117B P0441 P0455 . FUEL/AIR MIXTURE IS LEAN . AND I
> HEAR THE FUEL PUMP MAKING THAT NOISE THAT INDICATES A BAD FUEL
> PUMP. IT'S WHEN I PUT THE KEY IN I HEAR IT LOUD ENOUGH AND IF I TURN
> THE KEY ON IT DOES IT AGAIN. WHEN I PUT IT ON P IT REVS AND RPM GOES
> UP AND THEN COMES DOWN, UP AGAIN DOWN AGAIN ... WHEN STOPPED AT
> A RED LIGHT THE CAR WANTS TO MOVE AND RPM KEEPS SHAKING.[8]

56.    On August 15, 2020, the owner of a 2019 Tacoma reported complete loss of power:

> I WAS DRIVING ON THE STREET THAT LEADS TO MY HOUSE WHEN MY
> TRUCK COMPLETELY SHUT OFF.I DO NOT BELIEVE THAT IT?S SAFE FOR ME
> AND MY FAMILY OR THE PUBLIC FOR THAT VEHICLE TO BE OUT ON THE
> ROAD.[9]

57.    On June 16, 2020, the owner of a 2019 Camry reported loss of power, like the

transmission slipping:

> IT FEELS LIKE THE TRANSMISSION IS SLIPPING WHILE I AM DRIVING. IT HAS
> DONE THIS SINCE I FIRST BOUGHT THE CAR. I TOLD THE TOYOTA
> DEALERSHIP WHILE IN FOR SERVICE AND THE SERVICE REP TOLD ME THAT
> THE PROBLEM IS MY FUEL PUMP BUT THEY WILL NOT FIX IT UNTIL MY CAR
> IS ACTUALLY "RECALLED" BY THE MANUFACTURER. I AM SCARED TO

---

[8]  NHTSA Complaint No. 11331260.
[9]  NHTSA Complaint No. 11349354.

DRIVE IT LONG DISTANCES OR HIGHWAY SPEEDS. IT HAPPENS EVERY SINGLE DAY AND EVERY SINGLE TIME I DRIVE THE CAR.[10]

58. On February 26, 2020, the owner of a 2019 Toyota 4 Runner faced a sudden stall:

I HAD BEEN DRIVING FOR TWO MINUTES ON A CITY ROAD GOING APPROXIMATELY 30 MPH, WHEN MY CAR SUDDENLY STALLED AND ALL THE INDICATOR LIGHTS CAME ON. THEN THE CAR STARTED ON ITS OWN AND I WAS ABLE TO TURN INTO A PARKING LOT. THEN THE CAR STALLED AGAIN AND I NOTICED SMOKE COMING OUT OF THE HOOD IN FRONT OF THE WINDSHIELD. I PUT IT IN PARK AND TOOK THE KEY OUT OF THE IGNITION. I GOT OUT OF THE CAR AND THE CAR RESTARTED AND STALLED ON ITS OWN A FEW MORE TIMES AFTER THAT. IT ALSO MADE A LOUD BEEPING SOUND THAT SOUNDED LIKE A CAR ALARM BUT WE DON'T HAVE AN ALARM INSTALLED.[11]

59. On March 17, 2020, the lessee of a 2019 Lexus RX350 filed the following complaint

with NHTSA:

WHILE DRIVING ON A CITY STREET THE WARNING LIGHTS CAME ON AND THE CAR STALLED. I WAS ALONE IN THE CAR AND IN DOWNTOWN CITY TRAFFIC WITH HONKING CARS BEHIND ME. I WAS ABLE TO RESTART THE CAR AFTER A FEW ATTEMPTS. A FEW DAYS AFTER THIS INCIDENT, WHILE DRIVING ON A VERY BUSY HWY AT 55MPH THE CAR ENGINE WAS SKIPPING AS IF ABOUT TO STALL. I HAD A PASSENGER IN MY CAR WHO EXPERIENCED THIS ROUGH RIDE AND MADE A COMMENT ABOUT IT. A FEW DAYS LATER, ON MARCH 8,2020, I RECEIVED AN EMAIL FROM LEXUS ENFORM SERVICES WITH A VEHICLE HEALTH REPORT INFORMING ME THAT MY VEHICLE REQUIRES ATTENTION DUE TO A SAFETY RECALL 20LA01. WHEN I LEASED MY VEHICLE, I WAS NEVER INFORMED OF THIS RECALL WHICH GOES BACK TO 01/13/2020. SAFETY IS A TOP CONCERN FOR ME AND I FULLY COMMUNICATED THIS TO THE SALESPERSON WHEN I LEASED MY CAR BUT I WAS NOT INFORMED OF THIS RECALL AT THAT TIME. I HAVE EXACTLY 2800 MILES ON MY CAR. I AM NOT ABLE TO USE IT BECAUSE THE SERVICE DEPARTMENT AT LEXUS DOES NOT HAVE A REMEDY AVAILABLE TO FIX THE LOW -PRESSURE FUEL PUMP AND THEY DO NOT KNOW WHEN THEY WILL HAVE IT. I WANT TO DRIVE A VEHICLE THAT IS SAFE NOT ONE THAT INCREASES THE RISK OF HAVING A CRASH.[12]

---

[10] NHTSA Complaint No. 11329225.
[11] NHTSA Complaint No. 11311657.
[12] NHTSA Complaint No. 11318534.

60.    On January 3, 2017, the owner of a 2015 Lexus LS460 reported a shut down:

FUEL SYSTEM SHUTS DOWN WHILE DRIVING AT HIGHWAY SPEEDS BAND NEW CAR WITH 7,623 MILES. HAD TO HAVE THE ENTIRE LOW END FUEL PUMP SYSTEM REPLACED. ISSUE STILL ONGOING. CAR WILL NOT START NOW.[13]

61.    Finally, on July 6, 2020, a 2019 Camry owner reported failure of the fuel pump at high speeds, followed by being told there was no available replacement part, leaving her to rent her own replacement vehicle:

VEHICLE WAS IN MOTION ON THE INTERSTATE AT 70 MPH. THE CHECK ENGINE LIGHT CAME ON AND THE ENGINE BEGAN TO STALL. I HAD TO PULL OVER ON SIDE THE ROAD TO PREVENT FROM GETTING HIT BY AN 18 WHEELER FROM THE REAR. I WAS ABLE TO DRIVE THE VEHICLE A WHILE LONGER BEFORE THE ENGINE STALLED AGAIN. I HAD TO GET THE VEHICLE TOWED TO THE NEAREST TOYOTA DEALERSHIP. THEY REPORTED AN ISSUE WITH THE FUEL PUMP. THE DEALERSHIP REPORTED HAVING MANY ISSUES WITH THE FUEL PUMP FOR THE 2019 CAMRY. ON THE DATE OF JUNE 29TH REPAIR APPOINTMENT, THEY REPORTED THEY FUEL PUMP IS ON BACK ORDER AND THEY WOULD NOT BE ABLE TO GET THE PART UNTIL JULY 22ND, 2020 DUE TO SO MANY VEHICLES HAVING THAT DEFECT. HOWEVER, THE PART IS UNDER WARRANTY AND WOULD BE COVERED. AS A RESULT, I HAD TO PRIVATELY RENT A VEHICLE WITHOUT BEING OFFERED A LOANER CAR OR A RENTAL FOR 2 WEEKS. I HAD TO SPEND APPROXIMATELY 1,000 IN EXPENSES TO COVER THE COST OF NOT HAVING A VEHICLE. THE VEHICLE WAS TOWED TO A DEALERSHIP IN A REMOTE AREA FAR FROM HOME AND WORK. MY DISABLED MOTHER HAD TO BOOK A HOTEL TO CHECK THE VEHICLE STATUS THE FOLLOWING DAY WITH MY FATHER. I'VE HAD THE VEHICLE FOR 8 MONTHS WITH 29,000 MILES. WHEN I PLACED MY VIN NUMBER IN THE SYSTEM, MY VEHICLE WASN'T IDENTIFIED OR QUALIFIED AS A RECALL IN THE SYSTEM DESPITE THE DEALERSHIP CONFIRMING THEIR WERE PROBLEMS WITH THE FUEL PUMP AND THE DESCRIPTION OF THE VEHICLE DEFECT MATCHING ONE OF THE 5 IDENTIFIED RECALLS RELATED TO THE TOYOTA CAMRY. BASED ON MY VIN #, MY VEHICLE DIDN'T QUALIFY FOR ANY RECALLS, WHEN I CALLED THE TOYOTA RECALL OFFICE, THEY REPORTED MY VEHICLE DIDN'T MEET RECALL STANDARDS.[14]

---

[13]    NHTSA Complaint No. 10939537.
[14]    NHTSA Complaint No. 11337655.

**D.        Toyota Marketed the Class Vehicles as Safe  and Reliable**

62.      One of Toyota's key marketing points has always been the practical claims of the

safety and reliability of their vehicles.  This has been a premium message for Toyota to develop since

the time when the unintended acceleration in its hybrid vehicles pushed questions of the safety of its

vehicles into the headlines.  Defendant wants and intends consumers, including  purchasers of Class

Vehicles, to buy their vehicles because they believe them to be safe and   reliable as asserted by

Defendant.

63.      As a centerpiece of its marketing, Toyota's website amplifies this message and

emphasizes the safety and  dependability of Toyota and Lexus vehicles, including the Class

Vehicles. Below is a screenshot from    Toyota's website dedicated to the safety of its vehicles:

www.toyota.com/safety.



64.      Toyota boasts that some of its vehicles, including some of the Recall Vehicles are

"Top Safety Picks" because, as Toyota admits, "safety is more than features – it's the lives of the

people who drive our cars."

65.     On this "safety" page, potential purchasers are also old by Toyota that it pours millions of dollars every day into the safety of its vehicles, which promise "Toyota Safety Sense":



66.     This message of safety is echoed with marketing related to each of the Class Vehicles, including the Recalled Vehicles.  For example, in the brochure for the 2019 Corolla, Toyota states that the "Corolla is loaded with the style, safety and tech you need to make your next move," and in the "Safety" section of the brochure made clear that safety is a standard feature:

SAFETY

# Safety is always in style.
# So we made it standard.

We want to help make your journey safe. That's why every new Corolla comes standard with the

67. The Product News Release for the 2018 Corolla also headlines "Stylish 2018 Toyota Corolla Offers Standard Toyota Safety Sense and Impressive Fuel Economy" and touts the "renowned Toyota quality, durability, and reliability."[15]

68. Similarly, in the Product News Release for the 2018 Camry, Toyota promises that "all of Toyota's traditional values of superlative build quality and safety" are in the Camry.[16]

69. In the "Safety" section of the brochure for the 2018 4 Runner, Toyota reassures owners that "you're not a danger seeker. Neither are we" when discussing the extensive safety features of the vehicle:

SAFETY

# The peace of mind you need to enjoy the peace of nature.

—

While your many adventures have earned you a bold reputation, you're not a danger seeker. Neither are we. That's why we've equipped 4Runner with an array of active and passive safety features. The standard Star Safety System™ is designed to help you avoid trouble. Our rigorous crash testing has helped us develop a comprehensive occupant protection system that features eight standard airbags,⁶ should trouble prove unavoidable.

70. Safety plays an equally important role for Toyota's marketing of its luxury, Lexus brand, promising "Peace of Mind" from the worries of safety in its brochures for the 2018 and 2019 Lexus GS, LX, RC and RX:

---

[15] https://pressroom.toyota.com/stylish-2018-toyota-corolla-offers-standard-toyota-safety-sense-impressive-fuel-economy/ (last visited Sep. 10, 2020).
[16] https://pressroom.toyota.com/all-new-2018-toyota-camry-launch/ (last visited Sep. 10, 2020).

# PEACE OF MIND, *STANDARD*

*Introducing Lexus Safety System+,*
*an integrated suite of class-leading*
*standard active safety equipment.*[411]

71.     Toyota's promises of the safety of its vehicles were broken by the use of the defective fuel pumps and failure to act to fully and adequately remediate the defect and fulfill the promises made through the recall.

72.     Even as Toyota has known for at least a year and a half about the Fuel Pump Defect, it decided to  continue to emphasize the long-term message that its vehicles are safe and reliable, including the Class Vehicles. Defendants never disclosed the Fuel Pump Defect or the unreasonable risk to safety it  poses.

73.     Toyota's advertising for Class Vehicles conveys a pervasive message that its vehicles are safe and reliable. Safety and reliability are material to consumers when purchasing  or leasing a vehicle, particularly a Toyota or Lexus vehicle.

74.     Toyota advertised Class Vehicles as safe and reliable, but it concealed the  danger of the Fuel Pump Defect before and after the sale or lease of the Class Vehicles and to the detriment of consumers.

**E.     Plaintiffs and Class Members Would Not Have Chosen or Would  Have Paid Less for Class Vehicles Had They Known of the Fuel Pump Defect**

75.     No owner or lessee of a Class Vehicle would have purchased their vehicle, or  would have paid less for their Class Vehicle, had they known of the defect or that Defendants would fail to fix a known defect in the fuel system.

76.     As a result of the Fuel Pump Defect in Class Vehicles and the costs associated with the defect, Plaintiffs and all Class members have   suffered injury in fact, incurred damages, and have suffered harm as a result of Defendants' acts and  omissions.

77.     Plaintiffs and each Class member suffered injury as they purchased their Class Vehicle under the express and implied warranties that their vehicles would operate safely and reliably  throughout the useful life of such vehicles. A vehicle containing the Fuel Pump Defect does not  operate as warranted and for its intended purpose because it does not operate safely or safely or reliably.  Accordingly, a Class Vehicle is worth less than it would have been without the fuels system defect.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.     Discovery Rule Tolling

78.     Within the time period of any applicable statutes of limitation, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Fuel Pump Defect in the Class Vehicles and misrepresenting the safety, quality, and reliability of the Class Vehicles.

79.     Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants did not report  information within their knowledge to federal and state authorities, the dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Defendants had   concealed information about the true nature of the Fuel Pump Defect in the Class Vehicles,  which was discovered by Plaintiffs only shortly before this action was filed. Nor, in any event,  would such an investigation on the part of Plaintiffs and other Class members have disclosed that   Defendants valued profits over the safety of its customers, their friends and family, and innocent  bystanders.

80.    For these reasons, all applicable statutes of limitation have been tolled by  operation of the discovery rule with respect to the claims asserted herein.

**B.    Fraudulent Concealment Tolling**

81.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time  period relevant to this action.

82.    Instead of disclosing the existence of the Fuel Pump Defect, Defendants falsely represented that the Class Vehicles were safe, dependable, reliable, and of high quality.

**C.    Estoppel**

83.    Defendants were under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the fuel system in the Class Vehicles.

84.    Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded  the true nature, quality, and character of the fuel system in the Class Vehicles.

85.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**VIII.   CLASS ALLEGATIONS**

86.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant  to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of  the following class:

> All persons or entities in the State of New Jersey who owned and/or leased a Toyota or Lexus vehicle with the defective Denso low-pressure fuel pump.

87.    Excluded from the Class are individuals who have personal injury claims resulting from the fuel system in the Class Vehicles. Also excluded from the Class are Defendants and their

officers, executives, subsidiaries and affiliates; governmental entities; and the Judge to whom this case is assigned and his/her immediate family.

88.    *Numerosity*. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believes—based on publicly available sales data for the Class Vehicles—that there are at least hundreds of thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from Defendants' books and records, as well as the recall reports that Defendants have submitted to NHTSA..

89.    *Commonality and Predominance*: Federal Rule of Civil Procedure 23(a)(2) & (b)(3): This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

   a.    Whether the Class Vehicles contain a defect in their fuel system;

   b.    Whether the Fuel Pump Defect is a safety defect;

   c.    The nature of uniform representations Defendants made about the Class Vehicles' safety and reliability.

   d.    Whether and how long Defendants knew about the defect in the fuel system of the Class Vehicles;

   e.    Whether concealed information about the defect;

   f.    The relevant warranties made by Defendants relating to the Class Vehicles, the fuel system and the Fuel Pump Defect;

   g.    Whether Plaintiffs and the other Class members overpaid for their Class Vehicles; and

h.    Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

90.    *Typicality*: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above.

*91.*    *Adequacy*: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class Representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

92.    *Declaratory Relief*: Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate declaratory relief, with respect to each Class as a whole.

93.    *Superiority*: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for the members of the Classes to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, such litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, a class action is suited and intended to manage such difficulties and provide the benefits of uniform and common adjudication, economy of scale, and comprehensive supervision.

**COUNT I**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)**

94.     Plaintiffs restate, reallege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows:

95.     Defendants and Plaintiffs and the Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

96.     Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

97.     The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.* ("N.J. CFA"), makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. § 56:8-2.

98.     Defendants engaged in unconscionable commercial practice or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Plaintiffs and the other Class members rely upon their acts of concealment, suppression, and/or omission.

99.     Defendants' conduct proximately caused injuries to Plaintiffs and the other Class members.

100.    Defendants intentionally, affirmatively, and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

101.    Plaintiffs and other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants' conduct in that  Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive   the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Defendants' misrepresentations, fraud, deceptive practices, and omissions.

102.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

103.    Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs and the other Class members seek an order enjoining Defendants' unlawful conduct, actual damages, treble damages, attorneys'  fees, costs, and any other just and proper relief available under the New Jersey CPA.

## COUNT II

## FRAUDULENT CONCEALMENT

104.    Plaintiffs restate, reallege and incorporate herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows:

105.    Defendants intentionally concealed that the Class Vehicles are defective.

106.    Defendants further affirmatively misrepresented to Plaintiffs and the general public in advertising and other   forms of communication, including standard and uniform material provided with each Class Vehicle and on its website, that the Class Vehicles they were selling had no significant defects,  that the Class Vehicles were safe, reliable, and of high quality, and would perform and  operate in a safe manner.

107.    The Class Vehicles purchased by Plaintiffs and the other Class members  contained defective fuel systems.

108.    Defendants knew or should have known about the defect in the Class Vehicles when these representations  were made.

109.    Defendants had a duty to disclose that the Class Vehicles contained a defect as alleged herein, because of Defendants' material representations and such a defect presented a risk to safety.

110.    The truth about the defective Class Vehicles was known only to Defendant; Plaintiffs and the other Class members did not know and could not reasonably know of these facts, and Defendants actively concealed  these facts from Plaintiffs and Class members.

111.    Plaintiffs and the other Class members reasonably relied upon Defendants' deception.

112.    Defendants' false representations and omissions were material to consumers because  they concerned the safety of the Class Vehicles, which played a significant role in the value  of the Class Vehicles.

113.    Defendants have still not made full and adequate disclosures and continue to defraud Plaintiffs and Class members by concealing material information regarding the defect in the  Class Vehicles.

114.    Plaintiffs and Class members were unaware of the omitted material facts  referenced herein, and they would not have acted as they did if they had known of the concealed  and/or suppressed facts, in that they would not have purchased or paid as much for the Class Vehicles with the Fuel Pump Defect, and/or would have taken other affirmative steps in light of  the information concealed from them. Plaintiffs and Class members' actions were justified.   Defendants were in

exclusive control of the material facts, and such facts were not generally known to   the public, Plaintiffs, or Class members.

115.    Because of the concealment and/or suppression of facts, Plaintiffs and Class members sustained damage because they own Class Vehicles that are diminished in value as a result of Defendants' concealment of the true safety and quality of the Class Vehicles. Had  Plaintiffs and Class members been aware of the Fuel Pump Defect, and Defendants' disregard for the truth, Plaintiffs and Class members would have paid less for their Class Vehicles or would   not have purchased the Class Vehicles.

116.    As a direct result of Defendants' concealment of the defect, Plaintiffs and the Class also incurred out of pocket damages related to the defect.

117.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that Defendants made to them.  Accordingly, an assessment of punitive damages is also appropriate.

**COUNT III**

**BREACH OF CONTRACT**

118.    Plaintiffs restates, reallege, and incorporate herein by reference, the preceding

119.    Defendants' misrepresentations and omissions alleged herein, including but not limited to, Defendants' concealment and suppression of material facts concerning the Class Vehicles, including the reliability and durability of the fuel system, caused Plaintiffs and  the other Class members to make their purchases or leases of their Class Vehicles.

120.    Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Class Vehicles, would not have purchased  or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased  different

vehicles that did not contain the Defective Fuel Pump. Accordingly, Plaintiffs and other   Class members overpaid for their Class Vehicles and did not receive the benefit of their  bargain.

121.    Each and every sale or lease of a Class Vehicle constitutes a contract between Defendants and the purchaser or lessee. Defendants breached these contracts by selling or leasing to  Plaintiffs and the other Class members defective Class Vehicles and by misrepresenting or failing to disclose material facts concerning the safety, durability, performance, and quality of  the Class Vehicles.

122.    As a direct and proximate result of Defendants' breach of contract, Plaintiffs and other Class members have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT IV

### VIOLATIONS OF 15 U.S.C. § 2301, *ET SEQ.* THE MAGNUSON-MOSS WARRANTY ACT

123.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

124.    Each Plaintiff and each Class Member is a "consumer" within the meaning of the Magnuson-Moss  Warranty Act, 15 U.S.C. § 2301(3).

125.    Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-  Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

126.    The Class Vehicles are "consumer products" within the meaning of the  Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

127.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is  damaged by the failure of a warrantor to comply with a written or implied warranty.

128.    Defendants' written warranty within the meaning of the Magnuson Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

129.    Defendants breached these warranties, as described in more detail above. Without limitation, the Class Vehicles are equipped with a defective fuel system that can cause loss of power and stalls.

130.    Plaintiffs and the other Class members have had sufficient direct dealings with either Defendants or their agents (*e.g.*, dealerships and technical support) to establish privity of contract with Defendant. Alternately, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and its dealers, and specifically, of Defendants' implied warranties.

131.    At the time of sale or lease of each Class Vehicle, Defendants knew, should have known, or was reckless in not knowing of their misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.

132.    Defendants have expressly admitted the existence of the Fuel Pump Defect and that it is a safety defect, but notwithstanding its recall of over one million Class Vehicles. It has not offered a fix or indicated that a fix is available. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

133.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

134.    Plaintiffs, individually and on behalf of the other Class members, seeks all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

## COUNT V

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.J. STAT. ANN. § 12A:2-314)

135.    Plaintiffs restate, reallege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows:

136.    Each Defendant is a merchant with respect to motor vehicles within the meaning of N.J. Stat. Ann. § 12A:2-314.

137.    Under N.J. Stat. Ann. § 12A:2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased a Class Vehicle from Defendants.

138.    The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

139.    Defendants marketed the Class Vehicles as safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiffs' and Class members' decisions to purchase the Class Vehicles.

140.    Plaintiffs and other Class members purchased the Class Vehicles from Defendants, or through Defendants' authorized agents for retail sales. At all relevant times, Defendants were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.

141.    Defendants knew or should have known the ordinary and specific use for which the Class Vehicles were purchased.

142.   Because of the Fuel Pump Defect, the Class Vehicles were not in  merchantable condition when sold and are not fit for the ordinary purpose of providing safe and  reliable transportation.

143.   Defendants knew about the defect in the Class Vehicles, allowing Defendants  to cure their breach of warranty if they chose.

144.   Any attempt by Defendants to disclaim or limit the implied warranty of merchantability  is unconscionable and unenforceable here. Specifically, such  warranty limitations are unenforceable because Defendants knowingly sold a defective product without informing consumers about the defect. Any applicable time limits contained in Defendants' warranty  periods are also unconscionable and inadequate to protect Plaintiffs and other Class members. Among other things, Plaintiffs and other Class members had  no meaningful choice in determining these time limitations, the terms of which unreasonably  favor Defendants. A gross disparity in bargaining power existed between Defendants on the one side and Plaintiffs and Class members on the other, particularly as Defendants knew of the defect at the time of sale.

145.   Plaintiffs and Class members have afforded Defendants a reasonable opportunity  to cure the breach of written warranties therefore would be unnecessary and futile.

146.   Defendants were provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

147.   Accordingly, Defendants are liable to Plaintiffs and Class  members for damages in an amount to be proven at trial.

**COUNT VI**

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

148. Plaintiffs restate, reallege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows:

149. Plaintiffs and other Class members entered into contracts with Defendants in connection with the acquisition of the Class Vehicles.

150. Plaintiffs and other Class members performed all material obligations under the contracts.

151. Implied in all contracts is a covenant of good faith and fair dealing, imposing a duty on the parties to act in good faith and deal fairly with one another.

152. Plaintiffs and other Class members had a reasonable expectation that, when they purchased their Class Vehicles from Defendants, the Class Vehicles would be free of defects, especially defects that affected the safety and operability of the Class Vehicles.

153. Defendants used their discretion to place inferior fuel pumps into the Class Vehicles without informing Plaintiffs and Class members that the fuel pumps would create a safety defect in the Class Vehicles.

154. Plaintiffs and Class members had no reason to know Defendants had such fuel pumps into the Class Vehicles.

155. Defendants breached the covenant of good faith and fair dealing and breached its contractual duty to Plaintiffs and Class members by selling and leasing these Class Vehicles with the defect.

156. As a direct and proximate result of Defendants' breach, Plaintiffs and Class members suffered damages, including being induced to purchase the defective Class Vehicles.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully requests that the Court enter judgment in their favor and  against Defendant, as follows:

A.    Certification of the proposed Class with Plaintiffs as Class Representatives;

B.    Appointment of Plaintiffs' counsel as Class Counsel;

C.    Restitution, including recovery of the purchase  price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles;

D.    Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial;

E.    Monetary relief under certain consumer protection statutes;

F.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

G.    An award of costs and attorneys' fees; and

H.    Such other or further relief as may be appropriate.

Dated: September 11, 2020                Respectfully submitted,

                                         /s/ Christopher A. Seeger

                                         Christopher A. Seeger
                                         Christopher Ayers
                                         SEEGER WEISS LLP
                                         55 Challenger Road, 6th Floor
                                         Ridgefield Park, New Jersey 07660
                                         (973) 639-1000
                                         cseeger@seegerweiss.com
                                         cayers@seegerweiss.com

                                         Scott A. George
                                         SEEGER WEISS LLP
                                         1515 Market Street, Suite 1380
                                         Philadelphia, PA 19102
                                         (215) 564-2300
                                         sgeorge@seegerweiss.com

                                         *Counsel for Plaintiff and the Proposed Class*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.


Dated: September 11, 2020      Respectfully submitted,

<u>/s/ Christopher A. Seeger</u>

Christopher A. Seeger
Christopher Ayers
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-1000

*Counsel for Plaintiff and the Proposed Class*